24-10070

IN THE

# United States Court of Appeals

## FOR THE ELEVENTH CIRCUIT

◆◆

PATRICK NATHANIEL REED,

*Plaintiff-Appellant,*

—v.—

SHANE RYAN, HACHETTE BOOK GROUP, INC., DOUG FERGUSON,
THE ASSOCIATED PRESS, FOX SPORTS, INC., *et al.*,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

## BRIEF FOR DEFENDANTS-APPELLEES HACHETTE BOOK GROUP, INC., SHANE RYAN, AND NYP HOLDINGS, INC.

CAROL JEAN LOCICERO
LINDA R. NORBUT
THOMAS & LOCICERO PL
601 South Boulevard
Tampa, Florida 33606
(813) 984-3060

JEREMY A. CHASE
JESSE FEITEL
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas,
   21st Floor
New York, New York 10020
(212) 489-8230

LAURA HANDMAN
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, D.C. 20005
(202) 973-4200

*Counsel for Appellees Hachette Book Group, Inc.,
Shane Ryan, and NYP Holdings, Inc.*

## <u>CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to 11th Circuit Rule 26.1-1, Appellees Hachette Book Group, Inc., Shane Ryan, and NYP Holdings, Inc. submit this list, which includes all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this matter, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party.

1.     Barksdale, Patricia D. (U.S. Magistrate Judge)

2.     Bloomberg L.P.

3.     Bloomberg, Inc.

4.     Chase, Jeremy A. (Appellate and trial counsel for Shane Ryan, Hachette Book Group, Inc. and NYP Holdings, Inc. dba The New York Post)

5.     Corrigan, Timothy J. (U.S. District Court Judge)

6.     Davis Wright Tremaine LLP

7.     Feitel, Jesse (Appellate and trial counsel for Shane Ryan, Hachette Book Group, Inc., NYP Holdings, Inc. dba The New York Post)

8.     Ferguson, Doug

9.     Fox Sports, Inc.

10.    Gillen & Lake LLC

11.    Greenberg Traurig, P.A.

12.    Hachette Book Group, Inc.

13.    Hachette Livre USA, Inc.

14.    Handman, Laura Rose (Appellate and trial counsel for Shane Ryan, Hachette Book Group, Inc., NYP Holdings, Inc. dba The New York Post)

15. Herbert, Gregory W. (Appellate and trial counsel for Bloomberg L.P. and Erik Larson)

16. Isaak Law Firm

17. Isaak, Melissa (Appellate counsel for Patrick Reed)

18. Klayman Law Group, P.A.

19. Klayman, Larry E. (Trial counsel for Patrick Reed)

20. Lagardère North America Inc.

21. Lagardère Media

22. Lagardère SA, which is traded on the Paris stock exchange (MMB-FR)

23. Lake, Anthony C. (Appellate counsel for Patrick Reed)

24. Larson, Erik

25. LoCicero, Carol Jean (Appellate and trial counsel for The Associated Press, Doug Ferguson, Shane Ryan, Hachette Book Group, Inc. and NYP Holdings, Inc., dba The New York Post)

26. Mello, Kimberly S. (Appellate counsel for Bloomberg L.P. and Erik Larson)

27. News Corporation (stock ticker symbols NWS & NWSA)

28. Newsham, Gavin

29. Norbut, Linda Riedemann (Appellate counsel for The Associated Press, Doug Ferguson, Shane Ryan, Hachette Book Group, Inc. and NYP Holdings, Inc., dba The New York Post)

30. NYP Holdings, Inc., d/b/a The New York Post

31. Reed, Patrick

32. Ryan, Shane

33. The Associated Press

34. Thomas & LoCicero PL

35.     Vivendi SA, which is traded on the Paris stock exchange (VIVEF-FR)

36.     Young, Savannah (Trial counsel for Bloomberg L.P. and Erik Larson)

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3, Hachette Book Group, Inc. and NYP Holdings, Inc. make the following statement as to corporate ownership:

Appellee Hachette Book Group, Inc. is a wholly owned subsidiary of Hachette Livre USA, Inc. Hachette Livre USA, Inc. is a wholly-owned subsidiary of Lagardère North America Inc.; Lagardère North America Inc. is a wholly-owned subsidiary of Lagardère Media (formerly Hachette SA); Lagardère Media is a wholly-owned subsidiary of Lagardère SA, which is traded on the Paris stock exchange; and more than 10% of Lagardère SA's outstanding stock is owned by Vivendi SE, which is traded on the Paris stock exchange.

NYP Holdings, Inc. d/b/a New York Post, states that it is a wholly owned subsidiary of News Corporation. News Corporation is a publicly traded corporation. No other publicly traded company owns 10% or more of the stock in NYP Holdings, Inc.

/s/ Jeremy A. Chase
Jeremy A. Chase

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Appellees Hachette Book Group, Inc., Shane Ryan, and NYP Holdings, Inc. do not believe that oral argument is necessary because this Court has previously addressed the strong First Amendment protections that are afforded to the commentary and statements challenged in this defamation action. The case was resolved below at the pleadings stage, and this Court is fully capable of applying its own First Amendment precedent to the allegations in the First Amended Complaint without devoting extra time and resources to an oral argument. Nevertheless, if this Court has any questions or concerns, Appellees Hachette Book Group, Inc., Shane Ryan, and NYP Holdings, Inc. would welcome the opportunity to address them during any oral argument.

# TABLE OF CONTENTS

PAGE

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ............................................. C-1 of 3

STATEMENT REGARDING ORAL ARGUMENT ........................... i

TABLE OF CITATIONS ...................................................... iv

STATEMENT OF JURISDICTION ............................................ 1

STATEMENT OF THE ISSUES............................................... 2

COUNTER-STATEMENT OF THE CASE..................................... 3

    A. Counter-Statement of Facts ............................................ 5

        1. The Parties ....................................................... 5

        2. The Tobacco Road Blues Article and the 2015 Book ............. 6

        3. The Book ......................................................... 8

        4. The Post Article ................................................. 11

    B. Procedural History ..................................................... 13

    C. Statement of Standard of Review ...................................... 14

SUMMARY OF ARGUMENT................................................ 15

ARGUMENT ............................................................... 17

    I.   THE DISTRICT COURT CORRECTLY CONCLUDED THAT REED FAILED TO PLAUSIBLY ALLEGE ANY APPELLEE PUBLISHED THE STATEMENTS WITH ACTUAL MALICE.................................................... 17

        A. Reed Failed to Allege Facts That Raise a Reasonable Inference of Actual Malice........................................ 19

B. The FAC and Documents Before the Court Negate Any Arguable Inference of Actual Malice ............................. 24

C. Reed Is Wrong That Actual Malice Is Presumed In Defamation Per Se Cases ............................................. 27

II. THE DISTRICT COURT CORRECTLY HELD THAT REED DID NOT PLAUSIBLY ALLEGE THE PUBLICATION OF A FALSE STATEMENT OF FACT ........... 28

A. Reed Confuses the Law on Crucial Elements of His Defamation Claims ................................................. 28

B. The District Court Correctly Held That None of the Statements Published in the Book Were False Statements of Fact ................................................................. 31

C. The District Court Correctly Held Only One of the NYP Statements Was Plausibly Alleged To Be A False Statement of Fact .................................................. 42

III. THE DISTRICT COURT CORRECTLY HELD REED'S DUPLICATIVE CLAIM FOR TORTIOUS INTERFERENCE WAS BARRED BY THE SINGLE ACTION RULE ................ 45

IV. IT WAS NOT AN ABUSE OF DISCRETION FOR THE DISTRICT COURT TO DISMISS THIS ACTION WITH PREJUDICE ................................................................ 47

V. ANY FURTHER ISSUES HAVE BEEN WAIVED FOR APPELLATE REVIEW ................................................. 51

CONCLUSION ................................................................. 51

CERTIFICATE OF COMPLIANCE ............................................ 53

CERTIFICATE OF SERVICE ................................................. 53

## <u>TABLE OF CITATIONS</u>

PAGE(S)

**Cases**

*Abbas v. Foreign Policy Grp., LLC*,
   975 F. Supp. 2d 1 (D.D.C. 2013), *aff'd*, 783 F.3d 1328
   (D.C. Cir. 2015) ....................................................... 34

*Affordable Aerial Photography, Inc. v. Trends Realty USA Corp*,
   2024 WL 835235 (11th Cir. Feb. 28, 2024) .............................. 51

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .................................................... 18

*Avena v. Imperial Salon & Spa, Inc.*,
   740 F. App'x 679 (11th Cir. 2018) ..................................... 49

*Axelrod v. Califano*,
   357 So. 2d 1048 (Fla. 1st DCA 1978) .................................. 27

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .................................................... 19

*Berisha v. Lawson*,
   973 F.3d 1304 (11th Cir. 2020), *cert. denied*,
   141 S. Ct. 2424 (2021) ............................................ 18, 25

*Byrd v. Hustler Magazine, Inc.*,
   433 So. 2d 593 (Fla. 4th DCA 1983) ................................... 29

*Callaway Land & Cattle Co. v. Banyon Lakes C. Corp.*,
   831 So. 2d 204 (Fla. 4th DCA 2002) ................................... 45

*Chaiken v. VV Publ'g Corp.*,
   119 F.3d 1018 (2d Cir. 1997)........................................... 26

*Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*,
   6 F.4th 1247 (11th Cir. 2021) ..................................... 19, 20

*Davis v. Costa-Gavras*,
   654 F. Supp. 653 (S.D.N.Y. 1987)...................................... 26

*Dongguk Univ. v. Yale Univ.*,
734 F.3d 113 (2d Cir. 2013) .............................................. 25

*Dunn v. Air Line Pilots Ass'n*,
193 F.3d 1185 (11th Cir. 1999) .......................................... 22

*Eiber Radiology, Inc. v. Toshiba Am. Med. Sys., Inc.*,
673 F. App'x 925 (11th Cir. 2016) ...................................... 14

*El Paso Times, Inc. v. Kerr*,
706 S.W.2d 797 (Tex. App. 1986) ....................................... 32

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974) ............................................. 18, 23, 29

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
491 U.S. 657 (1989) ................................................. 21, 22

*Herbert v. Lando*,
441 U.S. 153 (1979) .................................................... 22

*Herring v. Sec'y, Dep't of Corr.*,
397 F.3d 1338 (11th Cir. 2005) .......................................... 6

*Horsley v. Rivera*,
292 F.3d 695 (11th Cir. 2002) .......................................... 29

*Jackson v. Bank of Am., N.A.*,
898 F.3d 1348 (11th Cir. 2018) ..................................... 48, 49

*Jacoby v. Cable News Network, Inc.*,
2021 WL 5858569 (11th Cir. Dec. 10, 2021) (per curiam) .............. 19

*Jones v. BuzzFeed, Inc.*,
591 F. Supp. 3d 1127 (N.D. Ala. 2022) ................................. 33

*Kist v. Hubbard*,
93 So. 3d 1100 (Fla. 5th DCA 2012) .................................... 21

*Klayman v. City Pages*,
2015 WL 1546173 (M.D. Fla. Apr. 3, 2015), *aff'd*, 650 F. App'x
744 (11th Cir. 2016)............................................. 21, 23, 28

*Klayman v. Judicial Watch, Inc.*,
22 F. Supp. 3d 1240 (S.D. Fla. 2014), *aff'd,* No. 14-13855
(11th Cir. Feb. 17, 2015)......................................... 30, 31, 46

PAGE(S)

*Liberty Lobby, Inc. v. Dow Jones & Co.*,
    838 F.2d 1287 (D.C. Cir. 1988) ............................................ 25

*Lohrenz v. Donnelly*,
    350 F.3d 1272 (D.C. Cir. 2003) ............................................ 25

*Maletta v. Woodle*,
    2021 WL 1894023 (M.D. Fla. May 11, 2021) ........................... 46

*Masson v. New Yorker Mag., Inc.*,
    501 U.S. 496 (1991) ......................................................... 30

*McCafferty v. Newsweek Media Grp., Ltd.*,
    955 F.3d 352 (3d Cir. 2020) ..................................... 32, 35, 44

*Michel v. NYP Holdings, Inc.*,
    816 F.3d 686 (11th Cir. 2016) ............................... 14, 19, 27, 50

*Milkovich v. Lorain Journal Co.*,
    497 U.S. 1 (1990) ............................................................ 29

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ..................................................... 17, 18

*Palm Beach Newspapers, Inc. v. Early*,
    334 So. 2d 50 (Fla. 4th DCA 1976) ....................................... 32

*Parekh v. CBS Corp.*,
    820 F. App'x 827 (11th Cir. 2020) ........................................ 49

*Perez v. Wells Fargo N.A.*,
    774 F.3d 1329 (11th Cir. 2014) ........................................... 14

*Presley v. Graham*,
    936 F. Supp. 2d 1316 (M.D. Ala. 2013) ................................. 42

*Reed v. Chamblee*,
    No. 3:22-cv-1059 (M.D. Fla.) .............................................. 3

*Rusovici v. Univ. of Cent. Fla. Bd. of Trustees*,
    2023 WL 9190224 (M.D. Fla. Dec. 9, 2023) ............................ 49

*Schiller v. Viacom, Inc.*,
    2016 WL 9280239 (S.D. Fla. Apr. 4, 2016) .............................. 29

*Sloan v. Shatner*,
    2018 WL 3769968 (M.D. Fla. June 22, 2018) ........................... 50

vi

*Smith v. Ocean State Bank*,
    335 So. 2d 641 (Fla. 1st DCA 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*St. Amant v. Thompson*,
    390 U.S. 727 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Straw v. Chase Revel, Inc.*,
    813 F.2d 356 (11th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Turkey Creek, Inc. v. Londono*,
    567 So. 2d 943 (Fla. 1st DCA 1990), *approved,* 609 So. 2d 14
    (Fla. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Turner v. Wells*,
    198 F. Supp. 3d 1355 (S.D. Fla. 2016), *aff'd*, 879 F.3d 1254
    (11th Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Turner v. Wells*,
    879 F.3d 1254 (11th Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 19, 20, 30

*Zambrano v. Devanesan*,
    484 So. 2d 603 (Fla. 4th DCA 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

**Rules**

Fed. R. Civ. P. 8(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 47

Fed. R. Civ. P. 15(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

**Constitutional Provisions**

U.S. Const. amend. I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 29, 30

## STATEMENT OF JURISDICTION

Appellees Hachette Book Group, Inc., Shane Ryan, and NYP Holdings, Inc. agree with the jurisdictional statement on page 1 of Reed's Appeal Brief; namely, that this is a timely appeal taken from a final decision of the district court to the extent that it relates to the merits of the claims asserted against the Appellees.

## STATEMENT OF THE ISSUES

The issues in this appeal are:

(a) Whether the district court properly dismissed Appellant Patrick Reed's lawsuit against the Appellees where Reed failed to allege that any Appellee published any of the allegedly defamatory statements with the requisite level of fault, actual malice, where Reed failed to plead a single false statement of fact – a fundamental requirement to state a defamation claim – and where Reed failed to allege a plausible claim for relief for any of his tagalong causes of action; and

(b) Whether the district court properly exercised its discretion in dismissing Reed's operative pleading, the First Amended Complaint, with prejudice when Reed never moved to further amend his complaint, and when the district court dismissed his prior complaint as a shotgun pleading and subsequently found that Reed's amended pleading failed to cure the defects identified in the order dismissing his prior complaint.

## **COUNTER-STATEMENT OF THE CASE**

This appeal arises from the complete dismissal of Plaintiff Patrick Reed's defamation lawsuit against Hachette Book Group, Inc. ("Hachette"), Shane Ryan, and NYP Holdings, Inc. ("NYP"), publisher of the NEW YORK POST (the "Post") (collectively, "Appellees") challenging various statements contained in Ryan's book, *The Cup They Couldn't Lose: America, the Ryder Cup, and the Long Road to Whistling Straits*, and the POST's corresponding news article reporting on the book and the cloud of controversy that has followed Reed, one of professional golf's most infamous and well-covered figures, and how his checkered history played into his being left off the roster of the 2021 U.S. Ryder Cup team.  The book and article address several well-publicized incidents that have followed Reed through much of his collegiate and professional golf career.  Following his defection from the PGA Tour to the Saudi-backed LIV Golf league in June 2022, Reed filed this and a similar companion lawsuit in what appears to be an attempt to silence news reporting on him and his new financial backers.[1]

---

[1] Reed also filed a defamation lawsuit against a separate set of golf journalists and news outlets challenging their reporting on his performance at a golf tournament in California and his decision to join the LIV Golf league.  *See Reed v. Chamblee*, No. 3:22-cv-1059 (M.D. Fla.) ("*Reed I*").  Below, the district court granted Reed's motion to transfer this action to the same district judge presiding over *Reed I* (Dkt.# 12), and the dismissal order evaluated and dismissed *Reed I* with prejudice (Dkt# 86).  Reed's appeal of the *Reed I* dismissal is separately pending before this Court. No. 24-10058 (11th Cir.).

After comprehensive briefing from all parties and a nearly three-hour oral argument, the district court addressed the substance of Reed's allegations in a well-reasoned, seventy-eight page order and disposed of each of Reed's claims and over *fifty* different allegedly defamatory statements between the two actions in meticulous and thoughtful detail.  Dkt.#86 (the "Order").  As it relates to Appellees, against whom Reed has challenged 14 statements, the district court held that for all but one statement, Reed failed to plausibly allege a false statement of fact (*i.e.*, a statement that was neither true nor a non-actionable opinion) that could form the basis of a defamation claim, Reed failed to plead facts that could raise a plausible inference that *any* of the statements were published with actual malice, and Reed's tagalong claim for tortious interference was barred by the single action rule.  As Reed's initial complaint was previously dismissed *sua sponte* as a shotgun pleading and he wholly failed to cure the deficiencies identified therein, the district court deemed any further amendment futile, and thus granted the motion to dismiss the First Amended Complaint, Dkt.# 27 ("FAC") with prejudice.[2]

---

[2] Citations to the record herein cite the docket number in the District Court followed by the page number or numbers in the form "Dkt.#_ at _."  While all documents that the Appellees rely upon are contained in Reed's appendix, because that appendix is not bookmarked, it may be difficult for this Court to find certain documents therein. To assist this Court, Appellees' supplemental appendix will also include certain key documents relied upon herein.

The questions before this Court on appeal are whether the district court properly dismissed Reed's FAC and whether it abused its discretion in dismissing the FAC with prejudice.  In his appellate brief (Dkt# 26, "Brief"), Reed has not identified a single basis on which to reverse the district court's order.  Instead, he confuses legal principles, cites inapposite case law, ignores controlling case law, omits critical context for the statements he alleges are defamatory, and wholly mischaracterizes the district court's careful decision.  Put simply, none of Reed's arguments have merit, and the district court's order dismissing his FAC with prejudice should be affirmed.

## A.     <u>Counter-Statement of Facts</u>

To enable the Court to gain a complete picture of the claims at issue, a more fulsome recitation of the statements at issue and the relevant publications is in order.[3]

### 1.     <u>The Parties</u>

Shane Ryan is a sportswriter who has authored two books about the PGA Tour, which both included reporting about Reed. Hachette Books (an imprint of Hachette) is the publisher of Ryan's 2022 book, which Reed challenges in this action.  NYP is the publisher of the NEW YORK POST, which has published multiple

---

[3] Appellees have submitted to the Court physical copies of the Book and the 2015 Book as part of their Supplemental Appendix, and cite to pages in those works at "Book at _" and "2015 Book at _," respectively. The district court received and considered copies of the books in the Order (Dkt.#34-1 & 34-2; Order at 27-28 n.10), and the complete works are necessary to evaluate each of the challenged statements.

reports about the PGA Tour and about Reed, including the September 2022 POST article, written by freelancer Gavin Newsham,[4] challenged by Reed in this action. Plaintiff Patrick Reed is a professional golfer.

## 2.    The Tobacco Road Blues Article and the 2015 Book

Years before the publication of the statements at issue in this suit, Shane Ryan spent all of 2014 embedded with the PGA Tour working on his book *Slaying the Tiger: A Year Inside the Ropes on the New PGA Tour* (the "2015 Book"), which provided an inside look at multiple rising stars on the PGA Tour who were transforming the game of golf after Tiger Woods' decade-plus dominance over the sport was coming to a close.  One of the golfers profiled in Ryan's 2015 book was Patrick Reed.  After Ryan turned in the manuscript of his book, but before publication, on January 30, 2015, Ryan published "a sample of [his] work from the past year" including "a few vignettes" of his reporting on Reed in an article for the Tobacco Road Blues website, titled "The Villain."

---

[4] Defendant Newsham is an independent journalist based in the United Kingdom (FAC ¶ 15) who was never served, despite Reed receiving numerous extensions of the service date below.  In addition to its decision dismissing this action with prejudice because Reed failed to "alleg[e] sufficient facts showing that ***any Defendant*** had actual malice" ( Order at 69 (emphasis added)), the district court also dismissed Reed's claims against Newsham without prejudice for failure to effect timely service.  *Id.* at 8-9.  Reed's Brief does not address the dismissal of his claims against Newsham for failure to prosecute, and as such, he has waived any such argument.  *See Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1342 (11th Cir. 2005) ("As we repeatedly have admonished, '[a]rguments raised for the first time in a reply brief are not properly before a reviewing court.'") (citation omitted).

The Tobacco Road Blues Article (Dkt.#34-7, "TRB Article") discussed Reed's successes, uber-competitiveness, brashness, and, most relevant here, a number of incidents from Reed's college career.  It discussed how he alienated his teammates at both University of Georgia ("Georgia") and Augusta State University ("ASU"); how he had been kicked off of the Georgia team for two alcohol-related arrests, the second of which he tried to hide from his coach; how prior to being kicked off of the Georgia team, his teammates accused him of cheating during a round, and separately, of stealing money, a watch, and a putter from a teammate's locker; and how Reed had been suspended for the first two tournaments of the season by his coach after his ASU teammates accused him of cheating during a qualifying event.

Ballantine Books published the 2015 Book, which devoted a chapter entitled "The Villain: Patrick Reed," to much of what was reported in the TRB Article. Additionally, the 2015 Book addressed Reed's response to the TRB Article, which consisted of a Golf Channel interview where he denied ever being suspended for cheating (something that Ryan never wrote), and presented sworn statements from (1) Chris Haack, his Georgia coach stating that he "was not aware of any allegations of cheating" and that such allegations "played no role" in Reed's dismissal from Georgia (2015 Book at 79-80), and (2) Josh Gregory, his ASU coach, claiming that though the relationship between Reed and his teammates was "very strained at this

time," Reed's suspension stemmed from a "scoring error" and that he had "no evidence that [Reed] ever cheated." (*Id.* at 82-83). The 2015 Book, however, reported that after Reed presented these affidavits and publicly denied Ryan's reporting, golf reporter Stephanie Wei wrote a follow up article reporting that "Haack confirmed that he *had* heard of these [cheating] allegations after Reed left Georgia" (emphasis in original), and that Reed's lawyers may be playing a "game of semantics." The 2015 Book also recounted how Wei reported that Reed's ASU teammates (whom she interviewed) did indeed accuse Reed of shaving strokes off his score in two straight qualifying rounds, his teammates held a meeting voting to kick him off the team, but Gregory suspended Reed for two tournaments instead. (*Id.* at 83).

### 3. <u>The Book</u>

On May 10, 2022, Hachette published the book at issue in this action, *The Cup They Couldn't Lose: America, the Ryder Cup, and the Long Road to Whistling Straits* by Shane Ryan (the "Book"), which chronicles the lead-up to the 2021 Ryder Cup, a golf tournament that pits a team of the best U.S. golfers against the best of Europe. Chapter 1 of the Book, titled "December 2019, Melbourne, Australia— Fires down under … the great escape … the end of the legend of Patrick Reed" (the "Book Chapter"), reports on Reed's participation in the 2019 Presidents Cup Tournament, and describes how events occurring at that tournament and other

controversies, including at another golf event just one week earlier, all but ensured Reed would be left off the 2021 U.S. Ryder Cup team.

The Book Chapter recounts that Reed and Ryan were "old friends, dating back to 2015," when Ryan wrote the TRB Article and 2015 Book (Dkt.#34-1 at 4); *see also* Dkt#34-2, Dkt#34-7, and repeated the reporting from Ryan's 2015 Book about Reed's college teammates accusing him of cheating, including that his ASU teammates held a meeting and voted to kick Reed off the team before coach Josh Gregory reduced the punishment to a two-match suspension. *See* FAC ¶72. Then, recounting Reed's reaction to the TRB Article as detailed in the 2015 Book, Ryan wrote:

> Reed set to work blundering his way into deeper trouble, which was the start of a PR strategy that he's doggedly stuck to ever since. He went on the Golf Channel, produced a couple of vague statements from his coaches, and generally took the path of full denial. The end result was that Reed's teammates who had previously been silent came out of the woodwork to crucify him further, confirming old details and adding new ones. *Deadspin* summed it up in a headline: "Patrick Reed Takes a Swing at Defending Himself, Slices into the Woods." And life moved on. Dkt.#34-1 at 2.

Moving on from his earlier reporting, the Book Chapter then tells of U.S. Team Captain Tiger Woods' surprising decision to name Reed to the 2019 Presidents Cup Team in Australia in light of his earlier issues with teammates, and his criticism

of 2018 Ryder Cup Captain Jim Furyk for not pairing Reed with his 2016 Ryder Cup partner, Jordan Spieth (at Spieth's request), at the 2018 tournament. *Id.* at 6.

The Book Chapter also recounts how one week prior to the 2019 Presidents Cup, a not-so-pleasant spotlight was shone on Reed yet again while playing at Woods' Hero World Classic tournament in the Bahamas. According to the Book – and as caught on camera – Reed was seen twice dragging his club backwards and sweeping away the sand in front of his ball. The Book reported that Reed had been "caught [] red-handed" by "[t]he TV cameras" and described his conduct as "blatantly illegal," echoing golfer Rickie Fowler's reaction to Reed's behavior. *Id.* The Book then noted that Paul Azinger, an announcer on the telecast, opined "If that's not improving your lie, I don't know what is" and that "He" – Reed – "knows better." *Id.* at 2-3.

The Book explained that the response to Reed's conduct was harsh and swift. He was assessed a two-stroke penalty when his round concluded, per the Book, and a short time later "someone dug up a clip of [Reed] doing the same exact thing at a 2015 tournament," which "for a guy whose credibility was already in the mud, who had been accused of cheating in the past, it was like throwing gas on the flames." *Id.* at 3. Golf Channel analyst Brandel Chamblee, according to the Book, "came out firing" at Reed by stating that "[d]eep down in the marrow of this team, they will be affected by this controversy" and that "[t]here's just no two ways about it. To defend

what Patrick Reed did is to defend cheating." *Id.* at 3. Woods had "'made a deal with the devil,'" Chamblee explained, and the Book went on to report that Reed's conduct had put his teammates "in an impossible situation and forced them to greet an obvious violation" of golf rules "with silence, putting their own integrity on the line." *Id.* at 3.

The Book then discusses the abuse fans hurled at Reed during the initial rounds of the 2019 Presidents Cup the next week, that led to Kessler Karain, Reed's caddie, fighting a fan. *Id.* at 11. The Book reported that Karain admitted that he "shoved" a fan who taunted, and Ryan then offered the tongue-in-cheek observation that "[i]t figured that the first time anyone on Reed's team had been honest and open with the media, it would be a caddie admitting he'd shoved a fan." *Id.*

The later chapters in the Book report on the American team's victory at the 2021 Ryder Cup, and Captain Steve Stricker's decision to leave Reed off the team after Reed contracted severe pneumonia just before the roster was publicly announced. *See* Book at 210-275. But Ryan's interview with Stricker for the Book revealed "that even if Reed had been perfectly healthy, it's unlikely that Stricker would have selected him." *See id.* at 234.

### 4.   The Post Article

On September 17, 2022, the NEW YORK POST published an article titled *The scandalous truth about Patrick Reed, the bad boy of golf* by freelancer Gavin

Newsham (the "Article"), which reported on portions of the Book and the earlier TRB Article and 2015 Book. *See* Dkt.#34-3. Drawing from the Books and the TRB Article, the Article reports on many of the same anecdotes from Reed's collegiate and professional golf career, and addresses several controversies Reed has endured during that time. These included Reed's being accused by his teammates of stealing[5] and cheating while at Georgia and later of cheating at ASU, along with Reed's denial of these accusations; Tiger Woods' asking Reed to join the 2019 Presidents Cup team after Jordan Spieth asked not to be paired with Reed again at the 2018 Ryder Cup; Reed's being penalized two strokes for improving his lie at the 2019 Hero World Classic tournament in the Bahamas, and professional golfers and commentators' harsh criticism of Reed after watching the video; the crowd heckling Reed at the 2019 Presidents Cup following the Bahamas tournament, culminating with his caddy admitting to shoving a fan; and the 2021 U.S. Ryder Cup team's jelling and winning the event without Reed. When describing Stricker's decision to omit Reed from the 2021 Ryder Cup team, the Article states that Stricker had "solved the perennial problem of Patrick Reed" – quoting that language from the Book. Dkt.#34-3

---

[5] The statement that Reed had been accused of stealing while at Georgia does not appear in the Book. Rather, Ryan first reported this fact in the TRB Article and it had subsequently been reported in other outlets including by *Deadspin* (Dkt.#34-8 at 1) and in a 2018 NEW YORK POST article. *See* Dkt.# 34-10 (reporting "accusations of cheating and stealing from [Reed's] teammates").

B.    **Procedural History**

On November 1, 2022, Reed initiated this action by filing a 92-page, 384-paragraph complaint (Dkt.#1), which the district court dismissed *sua sponte* without prejudice as a shotgun pleading (Dkt.#25).  On January 13, 2023, Reed filed the FAC which, asserts claims of defamation, defamation *per se*, defamation by implication and tortious interference against Ryan and Hachette over seven statements in the Book, and against NYP and Newsham over seven similar statements in the Article.[6] FAC ¶¶ 87, 123-172, 248-257 & Dkt.#34-4 (collectively, the "Statements").  On September 27, 2023, the district court issued its Order dismissing with prejudice all claims in both *Reed I* and *Reed II*.

The district court held as it pertains to Appellees in *Reed II* that all but the statement in the Article regarding Reed being accused of stealing in college were non-actionable either because they were matters of opinion, rhetorical hyperbole, or substantially true.  Order at 53.  It also held, however, that *every* challenged statement in the FAC must be dismissed with prejudice for failure to plausibly allege "facts sufficient to give rise to a reasonable inference that the false statement was made 'with knowledge that it was false or with reckless disregard of whether it was false or not,'" *i.e.*, with "actual malice."  Order, at 65, 67 (quoting *Michel v. NYP*

---

[6] Appellees direct this Court to an exhibit chart they prepared for the district court identifying and numbering each Statement, including text immediately before or after the Statements providing necessary context that the FAC omitted.  Dkt.#34-4.

*Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016)).  The court then dismissed Reed's claims for tortious interference because they are barred by Florida's single action rule, and Reed failed to "allege how each defendant unjustifiably interfered with his business relationships." *Id.* at 71-72 n.24.  Last, the court held that any further amendment of Reed's pleading would be fruitless and that it was therefore appropriate to dismiss the FAC with prejudice.  *Id.* at 72-73.[7]

**C.**    **Statement of Standard of Review**

While the district court's dismissal of Reed's FAC is reviewed *de novo* (*see*, *e.g.*, *Michel*, 816 F.3d at 694), the decision to dismiss the FAC with prejudice is reviewed for an abuse of discretion.  *See Eiber Radiology, Inc. v. Toshiba Am. Med. Sys., Inc.*, 673 F. App'x 925, 927 (11th Cir. 2016) ("we review a district court's decision whether to dismiss a complaint with or without prejudice for abuse of discretion.").

On page 11 of his Brief, Reed relies on *Perez v. Wells Fargo N.A.*, 774 F.3d 1329 (11th Cir. 2014) to assert that the decision to dismiss his FAC with prejudice

---

[7] Because all the Statements published in the Article were either drawn from the Book, the TRB Article, or from the 2015 Book, which were all published by reputable companies and written by a reputable author, NYP also asserted an additional defense – the wire service defense – which "provides 'a special protection for those who re-publish news reports from reliable news sources.'"   Order at 69 n.23 (citation omitted).  The court expressly declined to reach the application of the wire service defense to NYP "because none of the statements are actionable," (*id.*), however this serves an additional ground to affirm dismissal as to NYP.

is reviewed *de novo* by this Court.  But *Perez* addressed the irrelevant appellate review standard for an order "denying a plaintiff leave to amend because of futility" (*id.* at 1340).  This Court need not review the order here *de novo* since Reed never submitted a proposed second amended complaint or ever once sought leave to file an amended pleading.  Instead, after being given the opportunity to amend at the outset of the case, Reed forged ahead with opposing myriad motions to dismiss instead of moving for leave to amend his complaint another time.  *See also id.* (describing review standard to evaluate trial court's "deci[sion] whether to grant *a motion to amend*") (emphasis added).  Because the district court dismissed the FAC in the absence of any motion by Reed for leave to file an amended pleading, the dismissal with prejudice below is reviewed on appeal for an abuse of discretion.  But even if the review is *de novo* on futility grounds, dismissal with prejudice should still be affirmed given all the reasons that Reed's claims fails as a matter of law.

## **SUMMARY OF ARGUMENT**

This Court should affirm dismissal of this action on multiple grounds.  First, as the district court correctly held, "Reed does not meet the required pleading of actual malice to hold the press liable for defamation."  Order at 2.  On appeal, Reed continues to rely on conclusory actual malice "buzzwords," facially baseless claims of failure to investigate, and paper thin allegations of animus or ill-will that collectively are insufficient as a matter of law to survive a dismissal motion.  Reed

continues to ignore this Court's myriad decisions addressing how to evaluate a motion to dismiss for failure to plausibly allege actual malice under Fed. R. Civ. P. 12(b)(6), and instead embarks on a baseless campaign of relying on inapposite case law to convince the Court to apply an erroneous pleading standard.

Second, the district court correctly held that none of the challenged Statements in the Book, and only one of the Statements in the Article, arguably made a false statement of fact about Reed – they were either non-actionable opinion or substantially true. Reed's Brief does not identify a single basis to depart from those well-founded conclusions. Perhaps recognizing the Statements are not false statement of fact that can form the basis of a defamation claim, Reed shifts his focus to argue that defamatory implications may be drawn from each of the Statements. But the claimed implications are often nonsensical, pieced together from disparate allegations in the FAC, and easily obviated by the very text of the Book and Article, which Reed's Brief conveniently omits and repeatedly ignores.

Third, the district court properly held that Reed's claims for tortious interference were barred for the same reason as his failed defamation claims, a conclusion Reed has given no reason to depart from.

Last, Reed misreads case law to assert that he should be given another opportunity to amend his pleading, despite filing a second shotgun pleading after

being given leave to fix his initial complaint which suffered from the same defects as the first.

## **ARGUMENT**

Reed was required but failed to plead each element of a defamation claim: (1) publication of a provably false statement of fact (as opposed to pure opinion) to a third party; (2) the statement was defamatory; (3) falsity; (4) actual malice; and (5) actual damages. *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018) (citation omitted). Specifically, the district court correctly dismissed Reed's defamation claims because Reed failed to plead any facts that, if true, could raise a plausible inference that any Appellee published the Statements with actual malice, and, alternatively, each and every allegedly challenged Statement in the FAC except one were not false statements of fact. This Court should affirm.

## **I. THE DISTRICT COURT CORRECTLY CONCLUDED THAT REED FAILED TO PLAUSIBLY ALLEGE ANY APPELLEE PUBLISHED THE STATEMENTS WITH ACTUAL MALICE**

The Court should affirm the district court's dismissal of Reed's defamation claims with prejudice because he has wholly failed to plausibly plead actual malice. In light of this country's "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964), the Supreme Court has held that the First Amendment provides heightened protection against libel suits brought by

17

individuals "who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974). The First Amendment guarantees "a defendant may not be held liable for defaming a public figure about a matter of public concern unless he is shown to have 'acted with actual malice.'" *Berisha v. Lawson*, 973 F.3d 1304, 1310 (11th Cir. 2020) (citation omitted), *cert. denied*, 141 S. Ct. 2424 (2021).[8]

Importantly, "actual malice" does not mean common-law malice in the sense of ill will or spite; it means knowledge of falsity or reckless disregard for the truth. *Sullivan*, 376 U.S. at 279-80. Moreover, "reckless disregard" does not mean recklessness in the objective sense of gross negligence. Nor does it mean failure to investigate. *St. Amant v. Thompson*, 390 U.S. 727, 733 (1968). It is, instead, a purely "subjective test" that addresses the defendant's state of mind. *Turner*, 879 F.3d at 1273. Essentially, "reckless disregard" means the defendant actually subjectively believed a statement was very likely false, but went ahead and published it anyway. *Id.* ("[The test] focus[es] on whether the defendant 'actually entertained serious doubts as to the veracity of the published account, or was highly aware that the account was probably false.'"). At the pleading stage, in the wake of *Ashcroft v.*

---

[8] Reed did not dispute his public figure status below, nor does he challenge the district court's determination that he is a public figure subject to the actual malice standard on appeal. Order at 66.

*Iqbal*, 556 U.S. 662 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), Reed was required to plausibly "allege facts sufficient to give rise to a reasonable inference that the false statement was made 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Michel*, 816 F.3d at 702 (quoting *Sullivan*, 376 U.S. at 280).

Applying that standard, courts within the Eleventh Circuit have repeatedly affirmed dismissal of defamation claims at the pleading stage where, like here, the plaintiff fails to come forward with plausible allegations of actual malice. *See*, *e.g.*, *Turner*, 879 F.3d at 1273; *Jacoby v. Cable News Network, Inc.*, 2021 WL 5858569, at *5-6 (11th Cir. Dec. 10, 2021) (per curiam); *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 6 F.4th 1247, 1253 (11th Cir. 2021); *Michel*, 816 F.3d at 703-04.

Here, after "[l]ooking past Reed's conclusory allegations of actual malice in both Amended Complaints," the district court held that the FAC "fall[s] short of alleging sufficient facts showing that any Defendant had actual malice," and that "[t]his deficiency is fatal to each defamation claim." Order at 69. The district court's conclusion and reasoning are sound and should be affirmed.

## A.    <u>Reed Failed to Allege Facts That Raise a Reasonable Inference of Actual Malice</u>

The district court correctly ruled that Reed failed to plausibly allege actual malice. The district court reached this conclusion by observing that after stripping

out any conclusory "buzzwords" or general allegations of malice, the FAC was left with the patently insufficient allegations that the Appellees (1) failed to investigate, specifically by 'choos[ing] not to speak with' certain college coaches, teammates, and PGA Tour officials," and (2) harbored "ill will or 'malice' in the ordinary sense of the term" against Reed.  *Id.* at 68-69.  This Court should affirm on this ground.

*First*, the district court was correct to "look[ ] past Reed's conclusory allegations of actual malice," to focus only on the factual allegations in the FAC.  *Id.* at 68.  Such general allegations of actual malice that conclusorily allege Appellees were "reckless" and "malicious" without any corresponding facts, are nothing more than "threadbare recitals of the elements of a cause of action," and do nothing to satisfy Reed's burden to plead actual malice.  *See*, *e.g.*, *Turner*, 879 F.3d at 1273 (affirming dismissal for failure to plead actual malice; plaintiffs pled defendants "'knowingly and recklessly' ignored or deliberately avoided learning information" but not "facts demonstrating that [d]efendants acted in these ways"); *Coral Ridge*, 6 F.4th at 1252 ("For starters, we can disregard the portions of the complaint where Coral Ridge alleged in a purely conclusory manner that the defendants acted 'with actual malice' ... [a]llegations such as these amount to threadbare recitals of the elements of a cause of action, which are insufficient to state a claim.").

On appeal, Reed bizarrely contends that "Florida appellate courts have found 'general allegations' of actual malice to be sufficient" to withstand a motion to

dismiss a defamation claim.   Brief at 31.  But the only case that Reed cites to support this erroneous statement of law – *Kist v. Hubbard*, 93 So. 3d 1100 (Fla. 5th DCA 2012) – is a state court case where the *Iqbal*/*Twombly* plausibility standard was not even at issue.   In any event, *Kist* does not stand for the proposition that a public figure plaintiff can withstand a motion to dismiss by "generally" alleging actual malice.   Rather, *Kist* merely referred to a separate trial court decision that the plaintiff "was only required to plead malice generally," a reference to *common law* malice (*id.* at 1102), not the constitutional "actual malice" standard of *Sullivan*. Otherwise, Reed cites no authority for the proposition that allegations of actual malice may be alleged generally under the *Iqbal/Twombly* pleading standard. Put simply, the lower court was correct to disregard Reed's conclusory recitation of actual malice "buzzwords" in ruling he failed to plausibly allege actual malice.

**Second**, the district court also was correct in ruling that "actual malice is not satisfied 'merely through a showing of ill will or 'malice' in the ordinary sense of the term.'"  Order at 69 (quoting *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 666 (1989) ("[A defendant's] motive in publishing a story ... cannot provide a sufficient basis for finding actual malice.")).  *See*, *e.g.*, *Klayman v. City Pages*, 2015 WL 1546173, at *13-14 (M.D. Fla. Apr. 3, 2015) (dismissing defamation claim on summary judgment for lack of actual malice where "Plaintiff's argument mostly focuses on Defendants' ill will towards Plaintiff"), *aff'd*, 650 F.

App'x 744 (11th Cir. 2016).  Indeed, as the Supreme Court held in *Harte-Hanks*, "[t]he phrase 'actual malice' is unfortunately confusing in that it has nothing to do with bad motive or ill will."[9]  491 U.S. at 667, n.7.  Reed nevertheless spends considerable time in his brief reciting allegations from the FAC – or more accurately, characterizations of conclusory allegations from the FAC – which he concedes would be (at best) probative of defendants' "hostility" toward Reed, not whether they believed the truth of what they were publishing.  Brief at 32 (raising conclusory allegations of a conspiracy between PGA Tour, DP World Tour, and Appellees to defame persons associated with LIV, including Reed); *id.* at 34-35 (raising hyperbolic language used in the publications as evidence of hostility).  But when subjected to the slightest scrutiny, these allegations are nothing more than rank speculation, or Reed's own highly implausible gloss on innocuous facts.  Reed's

---

[9] Reed ignores *Harte-Hanks*, and instead cites a lengthy parenthetical from the 1970 edition of a treatise, cited in a footnote in *Herbert v. Lando*, 441 U.S. 153, 164 n.12 (1979), to suggest that actual malice may be shown through "circumstances indicating the existence of rivalry, ill will, or hostility between the parties."  Brief at 33.  But Reed's reliance on this footnote is entirely misguided.  Initially, the *Herbert* Court cited the treatise in a footnote without applying it to the facts of the case or expounding on the excerpt further.  But also, the *Harte-Hanks* Court made clear ten years later that "the actual malice standard is not satisfied merely through a showing of ill will or 'malice' in the ordinary sense of the term."  491 U.S. at 666 & 667 n.7.  This Court's decisions are in accord with *Harte Hanks*.  *See*, *e.g.*, *Dunn v. Air Line Pilots Ass'n*, 193 F.3d 1185, 1198 n.17 (11th Cir. 1999) ("Ill-will, improper motive or personal animosity plays no role in determining whether a defendant acted with 'actual malice.'").

argument that these weak allegations of hostility can render his claims of actual malice plausible are simply meritless.

**Third**, the district court rightly concluded Reed's allegations that Appellees failed to investigate by "choos[ing] not to speak with" certain coaches, teammates, and PGA Tour officials does not "pass muster."  Order at 68.  Indeed, as the district court observed, the law is clear that "a publisher's deficient due diligence must go beyond a failure to investigate, and must actually rise to extreme departure of publishing standards, which is not alleged factually here."  *Id.*at 69 (citing *Michel*, 816 F.3d at 703 ("[A] failure to investigate, standing on its own, does not indicate the presence of actual malice." (citation omitted)) and *Klayman*, 2015 WL 1546173 at *16 (rejecting the argument that defendants' failure to contact plaintiff prior to publication established actual malice)); *see also Gertz*, 418 U.S. at 332 ("mere proof of failure to investigate, without more, cannot establish reckless disregard for the truth").

But even if failure to investigate *could* raise an inference of actual malice, the publications themselves and documents in the record on appeal directly controvert Reed's conclusory assertions.  For example:

- As the Book notes, Ryan had received and reviewed the statements of Reed's former coaches (*see*, *e.g.*, FAC ¶¶ 73, 75), and neither statement contradicted Ryan's prior reporting.  Indeed, Ryan explained as much in the 2015 Book as well. 2015 Book at 79-83.

- The *Deadspin* article, which is directly referenced in the Book when discussing the response of Reed's teammates to his 2015 denials, explains that many of Reed's teammates contradicted Reed's denials and supported Ryan's prior reporting.  Dkt.#34-8.

- Ryan had no reason to speak with PGA Tour officials as Reed's conduct while on the Tour was captured on a national television broadcast, and Ryan reported the exact penalties Reed admits he received.  Book at 7; FAC ¶ 78.

In the face of this dispositive law and damning facts, Reed nevertheless maintains on appeal that, "[c]ontrary to the District Court's conclusions, the defendants' failure to conduct any investigation prior to publishing their defamatory statements regarding Mr. Reed is, in fact, evidence that the defendants acted with actual malice."  Brief at 33.  But he provides no reason to depart from the district court's decision directly addressing and rejecting this same argument below.  Simply put, the idea that Appellees failed to investigate prior to publishing is itself implausible based on Reed's own allegations and the publications at issue, and legally insufficient based on the overwhelming weight of authority.

**B.**     **The FAC and Documents Before the Court Negate Any Arguable Inference of Actual Malice**

While the obvious shortcomings of Reed's actual malice allegations were sufficient for the lower court to dismiss his defamation claim without going further, the FAC and documents before the Court affirmatively *negate* any inference that Appellees published the Statements with actual malice.  For example, the Book and Article prominently incorporate Reed's denials or explanations in response to many

24

of the Statements, which undercuts any claims of actual malice. *See* Dkt#34-1, Dkt#34-3; *see* FAC ¶¶ 95, 100. *See generally*, *e.g.*, *Lohrenz v. Donnelly*, 350 F.3d 1272, 1286 (D.C. Cir. 2003) ("Reporting perspectives at odds with the publisher's own 'tends to rebut a claim of malice'") (citation omitted).

Likewise, the vast majority of the Statements are premised upon disclosed (and in the case of the Article, hyperlinked) reputable sources, which courts in this Circuit and around the country hold preclude a finding of actual malice. *See*, *e.g.*, *Berisha*, 973 F.3d at 1313 (no actual malice because "[t]he law is clear that individuals are entitled to rely on 'previously published reports' from 'reputable sources'") (citation omitted); *Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 124 (2d Cir. 2013) ("[W]here reporters' false statements in an article were based on reliable sources, the defendants could hardly be accused of gross negligence, much less actual malice") (citation and internal quotation marks omitted); *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1297 (D.C. Cir. 1988) ("good faith reliance on previously published reports in reputable sources" precluded finding of actual malice as matter of law).

Further, while Reed's brief points to Ryan's having "published a book in 2015 containing malicious and defamatory statements concerning Mr. Reed ... and that Newsham … had republished Ryan's defamatory statements regarding Mr. Reed"

(Brief at 32),[10] these allegations cut *against* actual malice, as Reed confirms he has left the Statements about his time in college unchallenged for the last seven-plus years before he filed this lawsuit. *See also* Brief at 5 (explaining that, in 2015, Ryan first reported about cheating and stealing allegations made against Reed). After Reed initially denied those allegations, Ryan responded at the time via Tweet that he "stood squarely behind his reporting" notwithstanding Reed's denial. Further, Reed acknowledges that Ryan's reporting has been "republished countless times ... in the years since," (FAC ¶ 38) and was even the subject of a 2018 POST article that Reed has never challenged.[11] *Cf. Chaiken v. VV Publ'g Corp.*, 119 F.3d 1018, 1032 (2d Cir. 1997) (no actual malice where publisher "relies upon the integrity of a reputable author and has no serious reason to question the accuracy of the information provided by that author"). Further, Reed never brought a defamation lawsuit against Ryan or his then-publisher over the 2015 statements. *Davis v. Costa-Gavras*, 654 F. Supp. 653, 656 (S.D.N.Y. 1987) (filmmakers' knowledge that no legal action taken challenging claims from source material book written four years earlier evidences *lack* of actual malice). Reed waited more than seven years after

---

[10] As set out above, given that all but one of the Statements in the Article are derived from the Book, and the one statement that is not drawn from the Book – the statement that he was accused of stealing from his teammates – is drawn from the TRB Article (as well as the POST'S unchallenged prior reporting from years earlier), the claims against NYP are independently subject to dismissal under the wire service defense. *See supra* Note 5.

[11] *See* Dkt.#34-10, *supra* Note 5.

the publication of the TRB Article and 2015 Book to bring this lawsuit, which is based in large part on Ryan's and the POST'S restatement of those same unchallenged statements. These allegations cut squarely against, not in favor of, actual malice.

### C. Reed Is Wrong That Actual Malice Is Presumed In Defamation Per Se Cases

In a last ditch effort to save his claim, Reed argues the Statement reporting that Reed's teammates accused him of stealing from them in college "was defamatory per se and, pursuant to Florida law, raises a presumption of malice as a matter of law." Brief at 35. But this is a plain misstatement of the law, and one that the district court thoughtfully rejected. Order at 66-67 n.22. There is no reason to depart from the district court's holding.

The Eleventh Circuit has already ruled that "Actual malice may not be presumed." *Straw v. Chase Revel, Inc.*, 813 F.2d 356, 363 n.7 (11th Cir. 1987). Rather, "as a matter of constitutional law, where a public figure sues for defamation, he must prove the publication of a knowing or reckless falsehood (the 'actual malice' standard) to recover." *Michel*, 816 F.3d at 695. Further, the case law Reed cites in support of this constitutionally unsound theory – *Axelrod v. Califano*, 357 So. 2d 1048, 1050 (Fla. 1st DCA 1978), and three cases it cites that were decided in the 1930s (*see* Brief at 35) – all pertain to *common law* malice and the presumption of damages, not the constitutional actual malice applicable to Reed's claims here. In any event, the cases *Axelrod* relies upon predate by **nearly thirty years** the Supreme

27

Court's pronouncement of the constitutional "actual malice" standard in *Sullivan*. *See Klayman*, 2015 WL 1546173, at *14 n.14 ("Plaintiff's attempt to argue that malice is presumed when a statement is 'per se defamatory' fails because the cases Plaintiff directs the Court to all predate *New York Times*, or concern common law malice and not constitutional actual malice.").

In the end, Reed has not pled and cannot plead actual malice. This Court should affirm the district court's order dismissing Reed's defamation claims in their entirety.

## II. THE DISTRICT COURT CORRECTLY HELD THAT REED DID NOT PLAUSIBLY ALLEGE THE PUBLICATION OF A FALSE STATEMENT OF FACT

### A. <u>Reed Confuses the Law on Crucial Elements of His Defamation Claims</u>

While the district court dismissed Reed's defamation claims in their entirety on actual malice grounds, it also dismissed all but one statement in this lawsuit on the separate ground that Reed failed to plausibly allege the challenged statements were false statements of fact. Put differently, the Court ruled that each statement constituted non-actionable opinion, rhetorical hyperbole, or was substantially true on account of allegations set forth in or absent from the FAC. In an obvious effort to avoid the district court's sound reasoning and decision, Reed's appellate brief is rife with arguments that confuse these principles, misstate the applicable law, and attempt to import legal concepts applicable to defamation by implication claims –

allegations that, despite his assertion of "defamation by implication" counts, appear nowhere in the FAC. As such, a brief discussion of the core legal principles is in order to recenter the court's analysis.

Fifty years ago, the U.S. Supreme Court in *Gertz v. Robert Welch* declared that "[u]nder the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." 418 U.S. at 339-40. Following *Gertz*, courts in Florida and throughout this Circuit have repeatedly held that "[a] false statement of fact is the *sine qua non* for recovery in a defamation action." *Byrd v. Hustler Magazine, Inc.*, 433 So. 2d 593, 595 (Fla. 4th DCA 1983).

A statement must be objectively verifiable or falsifiable to be actionable in defamation. *Turner v. Wells*, 198 F. Supp. 3d 1355, 1369-70 (S.D. Fla. 2016), *aff'd*, 879 F.3d 1254. And the key question is not what a plaintiff alleges but "how a reasonable and common mind would understand the statements," not "a tortured interpretation" of them. *Schiller v. Viacom, Inc.*, 2016 WL 9280239, at *8 (S.D. Fla. Apr. 4, 2016). This principle "provides assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' [that] has traditionally added much to the discourse of our Nation." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990) (citation omitted); *see also Horsley v. Rivera*,

292 F.3d 695, 702 (11th Cir. 2002) ("loose, figurative language that no reasonable person would believe present[s] facts" are protected as opinion).

Further, "statements of pure opinion are protected from defamation actions by the First Amendment." *Turner*, 879 F. 3d at 1262. "Under Florida law, a defendant publishes a 'pure opinion' when the defendant makes a comment or opinion based on facts which are set forth in the publication or which are otherwise known or available to the reader or listener as a member of the public." *Id.* And "[w]here the speaker or writer presents the facts at the same time he or she offers independent commentary, a finding of pure opinion will usually result." *Zambrano v. Devanesan*, 484 So. 2d 603, 606 (Fla. 4th DCA 1986). "Alternatively, even if the speaker or writer does not present the facts, or does not present all of them, like comments may still justify a finding of pure opinion where the facts are already known to the audience." *Id.* The district court correctly concluded – as Reed concedes – that whether a statement is one of opinion or fact is a question of law for the court to decide. *Turner*, 879 F.3d at 1262-63.

Finally, even where a statement is capable of being proven true or false, defamation law "overlooks minor inaccuracies and concentrates upon substantial truth." *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 516 (1991). "Under the substantial truth doctrine, a statement does not have to be perfectly accurate if the 'gist' or the 'sting' of the statement is true." *Klayman v. Judicial Watch, Inc.*, 22

F. Supp. 3d 1240, 1253 (S.D. Fla. 2014) (citation omitted), *aff'd,* No. 14-13855 (11th Cir. Feb. 17, 2015).   A statement is only actionable if it is "substantially and materially false, not just if it is technically false.'"   *Id.* at 1253-54.  The district court carefully and correctly applied these principles to evaluate each Statement in the case.

**B.**   **The District Court Correctly Held That None of the Statements Published in the Book Were False Statements of Fact**

The district court correctly held that none of the statements published in the Book – not statements about accusations of cheating during college, opinions characterizing his conduct in the lead up to the 2019 President's Cup, nor any of the other miscellaneous hyperbolic statements he also challenged below – constituted false statements of fact that could form the basis of a defamation claim.  Put differently, the Court held that each Statement was either a matter of protected opinion or rhetorical hyperbole, or were substantially true based on Reed's own allegations.  Order  at 53.  On appeal, just as he did below, Reed cobbles together disparate allegations in his FAC and isolated phrases from the Book and calls it "mixed opinion" or a defamatory implication.  But his arguments conflate and misapply well-established principles of defamation law, and critically, he ignores what the Book actually says and its surrounding context.  The district court correctly cut through this noise and applied longstanding case law to conclude that the FAC should be dismissed.  This Court should affirm.

31

As Reed's FAC and Brief are primarily concerned with accusations of "cheating," Appellees address those first. Preliminarily, accusations of "cheating" are not the type of allegations that are susceptible to a precise meaning, particularly in the context of athletic events. And where, as here, the word "cheating" is used to characterize disclosed facts, it is clearly one of opinion. *See Palm Beach Newspapers, Inc. v. Early*, 334 So. 2d 50, 52 (Fla. 4th DCA 1976) (charge of "cheating" the public leveled against superintendent was non-actionable opinion); *El Paso Times, Inc. v. Kerr*, 706 S.W.2d 797, 799 (Tex. App. 1986) (statement that prosecutor "cheated" in criminal trial was opinion based on disclosed facts as it "constituted the reporter's perception of the federal judicial system," and was incapable of being proven true or false). Indeed, "[e]veryone is free to speculate about someone's motivations based on disclosed facts about that person's behavior." *McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 359 (3d Cir. 2020).

Addressing his teammates' accusations of cheating from college first, the district court saw through Reed's attempt to play a shell-game with his pleadings, recognizing that his entire claim as to accusations of cheating during college amounted to contesting an allegation never made in the Book or Article. While Reed alleged Ryan "falsely stated that he 'cheated during his NCAA playing career,'" the district court rightly turned to the Book itself, and observed that the publications report only that Reed was "accused by his teammates" at both Georgia and ASU of

cheating during qualifying events.  Order  at 55 (Ryan "never says that Reed cheated in the qualifying events, and a person of common mind would not believe he does."). Critically, as the district court observed, *nowhere* in Reed's nearly 400-paragraph FAC does he allege it is false that he was "accused by his teammates" of cheating. *Id.*  Rather, Reed denies that he *in fact* "cheated during his NCAA playing career," a statement made nowhere in either the Book or the Article.  FAC ¶¶ 73, 75, 96.  In other words, the Book reported what is indisputably true:  Reed's teammates accused him of cheating, and Reed has denied his teammates' accusations; exactly what Ryan reported.  Reed never denied – and indeed could not deny – that his teammates made these accusations.[12]

The law is clear that merely reporting on the undisputed fact that accusations were made against an individual is simply not a false statement of fact, and the district court grounded its decision in this law.  *See* Order at 56 (citing *Jones v. BuzzFeed, Inc.*, 591 F. Supp. 3d 1127, 1142 (N.D. Ala. 2022) (applying Alabama law and concluding that article titled "How Accusing a Powerful Man of Rape Drove A College Student To Suicide" was not defamatory because the facts in headline were true, as a person accused plaintiff of rape and later committed suicide)); *see*

---

[12] Reed all but admits that his Georgia teammates accused him of cheating when he twice alleges in the FAC in regard to the reports of cheating accusations that his teammates "had every reason to get rid of Mr. Reed on the team, and that is what they did."  FAC ¶¶76, 97.

*also Abbas v. Foreign Policy Grp., LLC*, 975 F. Supp. 2d 1, 19 (D.D.C. 2013) (contention that accusation was made "is not defamatory because it is not an assertion of false fact, or indeed, of *any* fact. [The journalist] is reporting on what people in the region have said to him, and does not otherwise take any position on what he has heard."), *aff'd*, 783 F.3d 1328 (D.C. Cir. 2015).

Reed's arguments on appeal do not grapple with what the district court actually held. Ignoring these findings, Reed now argues the Statements are actionable because they contain defamatory implications or are mixed expressions of opinion based on facts regarding Reed or his conduct that Reed claims were omitted from the Book or Article. *See* Brief at 17. Because these arguments misunderstand defamation law and ignore the district court's findings below, the allegations in Reed's own pleading, and the publications themselves, his efforts to seek reversal must be rejected for multiple reasons.

***First***, as he did below, Reed again ignores that the statement from Josh Gregory, Reed's ASU coach, confirms Reed *did* commit a violation during the NCAA qualifying event in question. Dkt.#34-5 ("Gregory Statement") ¶ 2(a) ("In a qualifying round for the NCAA Preview Tournament, Reed reported a score to me in a text message that was incorrect by one shot."). Gregory swore in his Statement that when confronted with the scoring error, Reed "acknowledged that the score was incorrect by one shot and that it was an honest, unintentional mistake," and that Reed

agreed to a suspension as punishment for the error "in order to keep the team together."[13]  *Id.* ¶¶ 2(b-d).  Thus, the Gregory Statement confirms Reed was indeed accused of shaving strokes off his scorecard and admitted to the infraction as the Book and Article report, rendering those statements substantially true.  Regardless of whether characterized as "cheating" or "an honest mistake resulting in suspension," it only confirms that different people can draw different conclusions as to a person's intent from fully disclosed facts.  *See McCafferty*, 955 F.3d at 359.[14]

Reed's Brief also disregards that the Book provided additional factual support for Ryan's report on these collegiate-era allegations by referring to a 2015 *Deadspin* article titled "Patrick Reed Takes a Swing at Defending Himself, Slices into the Woods" (the "*Deadspin* Article"), which, according to the Book, "summed [] up" the controversy over Reed's response to the cheating allegations (Book at 5), and

---

[13] Reed's Brief also ignores that the Book's reporting on his ASU team had "turned ... against him almost immediately" is substantiated by the Gregory Statement that, in college, he "was not well liked by his teammates, who repeatedly challenged Reed.  The relationship between Reed and the team was very strained during this time."  *Id.* ¶ 2(b).

[14] Although Reed challenges the statement from the Book that "[h]e'd been kicked out of Georgia after a year for two alcohol violations, the second of which he tried to hide from his coach," suggesting that he claims the statement is false and defamatory, nowhere in the FAC does Reed actually allege this statement is false.  Indeed, Reed does not challenge a substantially similar statement from the Article reporting on Reed's arrest for underage drinking and possessing a fake ID.  *See* Dkt.#34-3.  Thus, Reed's argument *in his Brief* that the Book falsely implied he "tried to conceal an alcohol violation from his coach" (Brief at 20) fails, because his FAC did not allege that this statement is untrue.

reported on how former teammates contacted journalists to express their displeasure at Reed's response to the allegations by pointing to several Tweets by Reed's ASU teammates corroborating that cheating allegations were made.[15]

The Book's express reference to the *Deadspin* Article makes clear that irrespective of the underlying truth of their claims, Reed's former teammates did in fact "c[o]me out of the woodwork to crucify him further" and that the teammates provided information that purported to "confirm old detail and add new ones" – rendering this Statement substantially true as well and providing yet another basis to affirm.  Reed's argument that the Book failed to disclose these facts is inaccurate and indeed ironic, as the Book specifically included "Reed's claims" denying any misconduct allegations, and it is *Reed* – not Ryan – who has omitted the Book's reference to the *Deadspin* Article from his pleadings and on appeal.  *See* Dkt.#34-4 at 2.[16]

---

[15] The Book also refers back to the 2015 Book, which separately reported how after Reed's public denials of cheating, Wei and golf reporter Steve Eubanks spoke with Reed's former teammates and they elaborated on the events leading to Reed's suspension.  2015 Book at 83.

[16] Reed's argument that the Book falsely implied that he "had 'a PR strategy' of taking a path of 'full denial'" (Brief at 21) must also be rejected because he alleges that his response to this reporting was to "provid[e] public statements by his coaches – who would have been privy to any cheating accusations – that they were unaware of any cheating accusations against Mr. Reed and importantly that he did not cheat." FAC ¶73.  In other words, Reed admits that it is substantially true that he denied these accusations and pointed to statements from his coaches to buttress his denial, rendering this Statement nonactionable on this additional basis.

*Second*, Reed argues that "Ryan's statements concerning alleged old and new 'crucifying' 'details' from Mr. Reed's teammates and his so-called 'PR strategy' of 'full denial' create[s] the defamatory inference that there was additional proof that Mr. Reed allegedly cheated *during the 2019 tournament*." Brief at 21 (emphasis added). But this argument is nonsensical because these Statements from the Book refer to Reed's response to *collegiate* cheating allegations first published in the TRB Article, which were unrelated to and took place years before the 2019 tournament during Reed's *professional* career. And, as discussed above, Reed again omits that the sentence in the Book after the "old and new crucifying details from Mr. Reed's teammates" refers to the *Deadspin* Article where those details were fully laid out.

*Third*, the district court correctly dismissed the Statement that after Reed's transfer to ASU, he "turned the entire team against him almost immediately…" Brief at 20. While Reed claims the Book failed to "provide supporting facts" for this Statement (*id.*), he does not identify any defamatory implication or any supporting facts that are missing. Instead, he conveniently ignores that the affidavit from his ASU coach – put forward by Reed and referenced in the Book – confirms Reed "was not well liked by his teammates," "the relationship between Reed and team was very strained during this time", and the suspension "creat[ed] some sparation and a cooling off period between Reed and his teammates." *See* Dkt.#34-5 at ¶ 2(b)-(c). Reed now even appears to admit that the other players on the ASU

team voted to remove him from the team "because they disliked the fact that" Reed was taking prominent roles from more senior members of the team (Brief at 27). This further reveals why this Statement is not actionable.

Having dispensed with the Statements reporting on Reed's college teammates accusing him of cheating, the district court turned to and dismissed the Statements reporting on how Reed improved the lie of his ball at the 2019 Hero World Classic Tournament – describing his conduct as "blatantly illegal," not "ambiguous," an "obvious violation," and that "the TV camera caught him red-handed."  The court correctly held that these statements were opinions based on how Ryan and other professional golfers and commentators perceived Reed's playing conduct  and that "[s]peakers, writers, and publishers have leeway in stating their impression of disclosed facts."  Order at 57.  Importantly, Reed admits that the facts underlying these opinions are true:  video footage from the event shows Reed twice brushing sand away from behind his ball.[17]  Reed also admits he was "assessed a two-stroke penalty" for his conduct depicted in the video.  FAC ¶ 78.  Reed's response on appeal – that the Book implied that he "actually did cheat" (Brief at 25) – falls flat, since

---

[17] *See* Dkt.#34-13.  While Reed below alleged that the video tape of this incident "was doctored ... on information and belief" (FAC ¶78) – a highly implausible claim given that the incident was captured live on the Golf Channel and Reed admitted on the day of the event that "after seeing the club go back and brush some sand, [the referees] thought that that's a breach in the rules of golf" (*see* Dkt.#34-11) – the district court correctly disregarded this allegation (Order at 57 n.21), and by ignoring it in his Brief, Reed has abandoned the argument on appeal.

Reed still cannot escape the fact that he was penalized for his conduct at the tournament. His argument provides no reason to disrupt the Order; it instead reflects his displeasure with how others perceived his conduct, which was indisputably wrongful according to golf officials.

Additionally, while not addressed expressly in the Order, the Statement that "[b]efore long, someone dug up a clip of him doing the same exact thing at a 2015 tournament," which Reed describes as a "manufactured cheating incident" (FAC ¶¶ 80-81) is substantially true because, in the same article for which Ryan quotes Golf.com reporter Dylan Dethier in the Book, Dethier reported on Reed making a "similar waste bunker practice swing" at the Hero World Classic in 2015, embedding his own Tweet with a video of it. *See* Dkt.#34-12. Reed's argument on appeal – that "Ryan accuses Mr. Reed of allegedly cheating in the 'same' manner at a tournament in 2015, but omits or fails to state the facts relating to the 2015 incident" – once again ignores the Book itself, which (1) never suggests that either incident constituted "cheating," and (2) reveals that it is substantially true that someone did dig up a clip of Reed doing the same exact thing at a 2015 tournament.

Reed's Brief again attempts to transform these statements from merely recounting indisputable facts, into a false implication "that Mr. Reed actually did cheat, and that other players would have damaged their integrity had they commented upon the incident." Brief at 25. But neither the Book nor the Article

said such a thing.  Rather, they merely reported on the facts that the public controversy at the 2019 Hero World Classic coupled with the resurfaced video "was like throwing gas on the flames" when considered against the backdrop of the earlier allegations of cheating from Reed's collegiate career.  As a result, he was "skewered," *i.e.*, it created a media firestorm, led to intense fan heckling at the Presidents Cup the following week, and placed his team members in the difficult position of having to defend his actions thus putting their integrity on the line.  As to this last point, while Reed alleges that he didn't "force[] his teammates to put their own integrity on the line" as "[t]hey are all adults capable of making their own decisions and saying what they want to say" (FAC ¶ 83), he adopts a hyper-literal reading of the statement that the district court rightfully refused to endorse.  No reasonable reader would believe Reed literally forced his teammates to say anything, and Reed implicitly acknowledges as much in the FAC when he said he "never forced his teammates to say anything, nor could he." *Id.* The only natural reading of this statement is that his teammates were placed in a position of having to defend him out of team unity in the wake of the swirling narrative around Reed.  This is plainly a subjective assessment of the disclosed facts, and is therefore non-actionable opinion.  At bottom, none of the "cheating" allegations are actionable false statements of fact.

Last, Reed's brief only addresses rhetorical hyperbole once in the separate context of the Statement about Reed's caddie from 2019, where after the caddy admitted shoving a fan, Ryan opined that "[i]t figured that the first time anyone on Reed's team had been honest and open with the media, it would be a caddie admitting he'd shoved a fan."[18]  This Statement was correctly dismissed below because it did not falsely imply, as Reed suggested, that Reed lied before, but rather, "in context, though perhaps strongly worded, expresses an opinion about the first time someone from Reed's team spoke after the backlash Reed received following the Hero World Challenge."  It continued, that while "snarky," the statement is "not objectively falsifiable."  Order at 59; *see also id.* at 40 ("[a]lthough rhetorically hyperbolic statements may 'at first blush appear to be factual[,] ... they cannot reasonably be interpreted as stating actual facts about their target.'" (citation omitted)).  As the Court observed below, no reasonable reader would think that was

---

[18] Below, Reed challenged a number of other opinions from the Book (and Article) reporting on the lead up to the 2021 Ryder Cup team that were plainly non-actionable opinion statements, including descriptions of Reed as a "problem" and that he was "skewered" and "in the mud" following criticism of his actions at the Hero World Challenge tournament, that Reed's "legend" had "ended" and that Reed's presence had caused "trouble" for those around him, and that Tiger Woods had "made a deal with the devil" by adding Reed to the 2019 Presidents Cup Team.  The district court correctly held that the Statements reporting on Reed during this time period were nonactionable hyperbolic opinions.  *See* Order at 58-59.  On appeal, Reed ignores this aspect of the Order and therefore has waived any argument as to those Statements.  *See infra* § IV.

actually the very first time "anyone on Reed's team" had made a truthful statement. *Id.* at 59.

In support of his argument that this hyperbolic statement was one of fact, Reed cites a single case, *Presley v. Graham*, where a court (applying Alabama law) declined to dismiss a defamation claim challenging a statement by the lead attorney for the plaintiff's employer that the plaintiff was a "supervisor's nightmare." Brief at 25. But the *Presley* case is inapposite because that court held that describing someone as a "supervisor's nightmare," without disclosing the underlying facts in support of the assertion, could plausibly suggest the employee was committing some type of misconduct. 936 F. Supp. 2d 1316, 1325-26 (M.D. Ala. 2013). That is clearly not the case here. For one, all of the facts underlying Ryan's hyperbolic statements – including the one about his caddy – were fully disclosed in the Book. Secondly, there is no reasonable implication to be drawn from this statement when read in the context of the publication as a whole. Thus, Reed's argument on appeal that this Statement implies that he "had allegedly been dishonest in their contacts with the media and are purportedly habitual liars" must be rejected. Brief at 25.

## C.     The District Court Correctly Held Only One of the NYP Statements Was Plausibly Alleged To Be A False Statement of Fact

After addressing the Statements published in the Book, the district court correctly dismissed each of the Statements published in the Article. All but one of the Statements in the Article are derived from the Book, and the one statement that

is not drawn from the Book – the statement that he was accused of stealing from his teammates – was drawn from the TRB Article.

Ignoring this dynamic, Reed principally argues that the district court wrongly dismissed claims challenging the Article because its analysis in this section of the Order was not as lengthy.  Brief at 26.  But the Court's addressing several of the challenged statements by category does not render its analysis incorrect or subject to reversal, since the Court *did* parse each of the challenged statements, even if it chose economy of language in its analysis.  The district court's grouping of the Statements in the Book and Article allowed for a more efficient opinion.

In any event, Reed's specific arguments about the Article – namely, that it "may clearly be read as implying that Mr. Reed possessed an 'ego,' engaged in 'petty feuds,' and was disruptive during his tenure playing on the U.S. team" (Brief at 27) – falls apart with a simple read of the Article.  The Article reported on Ryan's detailed investigation and catalogued admittedly true facts about Reed's career and earlier participation on the U.S. team, including that he received a penalty after improving the lie of his ball in the Bahamas, "was savagely abused by the crowd" when he appeared at the Presidents Cup tournament the following week, and because his previous Ryder Cup partner asked not to play with him at an earlier tournament. The statements that Reed had been "dogged by controversy" and was "*persona non grata*" were hyperbolic statements of opinion based off these admittedly true facts.

43

When reporting that the next Ryder Cup captain "solved the perennial problem of Patrick Reed" by leaving Reed off that team's roster (Dkt.# 34-3), the POST hyperlinked to its prior reporting survey results from U.S. golfers who had a "strong [] distaste for Reed" with the majority polled describing him as "arrogant."  Dkt.#34-9.  Reed does not and cannot maintain that any of this reporting is false: his career at this time was dogged with controversy, and when he was left off the roster, the Ryder Cup team's performance improved.  Reed's argument fails because the Article did not falsely imply that Reed's conduct was disruptive and played a part in the U.S. team's poor performance.  Rather, it reported in great detail that this was exactly what happened.

Finally, Reed's assertion that the Article "would have been understood by readers as accusing Mr. Reed of being a cheater and possessing a poor character for honesty and integrity based upon the stated alleged facts" (Brief at 27) once again ignores that the Article, like the Book, reported on true facts – the penalty assessed against Reed and his teammates' critical reaction – and then included Reed's position on each of those facts.  This accurate reporting is not the stuff of defamation liability.  *See*, *e.g.*, *McCafferty*, 955 F.3d at 357 ("When an article discloses the underlying facts, readers can easily judge the facts for themselves.").  In sum, the district court correctly dismissed all but one of the allegedly defamatory Statements

from the Article, and that Statement was correctly dismissed because Reed had failed to plead facts that could support a reasonable jury finding actual malice.

## III. THE DISTRICT COURT CORRECTLY HELD REED'S DUPLICATIVE CLAIM FOR TORTIOUS INTERFERENCE WAS BARRED BY THE SINGLE ACTION RULE

The Court should affirm the dismissal of Reed's tortious interference claims because they are all barred under Florida's single action rule, which "does not permit multiple actions to be maintained when they arise from the same publication upon which a failed defamation claim is based." Order at 70-71 (citation omitted). As the district court correctly observed, "Florida courts have held that a single wrongful act gives rise to a single cause of action, and that the various injuries resulting from it are merely items of damage arising from the same wrong." *Id.* (citing *Orlando Sports Stadium, Inc. v. Sentinel Star Co.*, 316 So. 2d 607, 609 (Fla. 4th DCA 1975)). "Thus, if the defamation count fails, the other counts based on the same publication must fail as well because the same privileges and defenses apply." *Callaway Land & Cattle Co. v. Banyon Lakes C. Corp.*, 831 So. 2d 204, 208 (Fla. 4th DCA 2002) (citation omitted). Here, as Reed's tortious interference claims were premised on the same conduct and harm as his deficient defamation claims, the district court correctly dismissed those claims as well. Order at 70-71.

On appeal, Reed argues that the Court should reverse the district court because the single action rule "constitutes a standard of proof, and not a pleading standard."

Brief at 44. But Reed cites no authority for this proposition, and he ignores that federal courts routinely apply the rule to dismiss tortious interference claims premised on the same underlying conduct as a deficient defamation claim plead in the same action, including in a case filed by Reed's own trial counsel. *See*, *e.g.*, *Judicial Watch*, 22 F. Supp. 3d at 1255-57 (applying single action rule to dismiss tortious interference claim filed by Reed's counsel); *Maletta v. Woodle*, 2021 WL 1894023, at *6 (M.D. Fla. May 11, 2021) ("the allegedly defamatory statements ... cannot form the basis for the conspiracy claim because they also form the basis for the defamation and defamation per se claims."); *see also* Order at 70-71 (collecting cases).

The district court dismissed the tortious interference claims because they are "premise[d] . . . on the defamation claims." *Id.* at 71. Reed apparently agrees, since his Brief acknowledges that the interference claims challenge exactly what his defamation claims target: the allegedly defamatory statements in the Book and Article. *See* Brief at 45 ("Mr. Reed has suffered loss of millions in sponsorships and business ventures ***as a result of the defendants' statements regarding him***.") (emphasis added). His final argument – that "Florida courts have found claims for tortious interference to be sufficient to state a claim in response to a motion to dismiss where the plaintiff's claim is based upon false or untrue statements" (Brief at 45) – rings especially hollow, as those cases are easily distinguishable or simply

irrelevant, either because the plaintiff had separately alleged a plausible defamation claim (*Turkey Creek, Inc. v. Londono*, 567 So. 2d 943 (Fla. 1st DCA 1990), *approved,* 609 So. 2d 14 (Fla. 1992)), or where the court declined to dismiss a tortious interference claim in a case that did not feature a defamation claim (*Smith v. Ocean State Bank*, 335 So. 2d 641 (Fla. 1st DCA 1976)).

As Reed acknowledges that he simply recast his defamation claims as one for tortious interference, and ignores this Circuit's case law applying the single action rule to analogous Rule 12(b)(6) motions, the district court properly dismissed the tortious interference claims.

## IV.  IT WAS NOT AN ABUSE OF DISCRETION FOR THE DISTRICT COURT TO DISMISS THIS ACTION WITH PREJUDICE

Reed fails to identify any abuse of discretion in the district court's decision to dismiss his lawsuit with prejudice, as it properly barred Reed from taking a third opportunity to assert claims it had properly dismissed on two prior occasions.

In its *sua sponte* order dismissing Reed's initial complaint as a shotgun pleading that failed to comply with the "short and plain" requirement of Rule 8(a), the district court afforded Reed an opportunity to amend, and cautioned that in "drafting the amended complaint, Reed is instructed to bring only those claims that are supported in law." Dkt.#25 at 3. Reed responded with an even longer FAC, which repeated virtually identical allegations against each Appellee for the remaining claims. After Appellees moved to dismiss the FAC (Dkt.##33-34), which

they had described as merely "another rambling shotgun pleading," Reed's opposition (Dkt.# 42) ignored that argument and declined to address the infirmities addressed in Appellees' dismissal papers.  After reviewing the FAC and the various dismissal motions, the district court's Order recognized that Reed's "amendments were sparse and he continued to assert the same alleged defamatory statements, while not curing the deficiencies identified in the Orders dismissing the original complaints."  Order at 72.[19]

The district court's decision dismissing the FAC with prejudice was not an abuse of discretion, for several reasons.  ***First***, the district court's *sua sponte* order dismissing Reed's original complaint put him on notice of the deficiencies in that pleading, which Reed failed to address in his FAC.  Once a trial court has "ordered [a plaintiff] to file a sufficient complaint ... [a] chance to amend a complaint does not need to come in the form of a dismissal without prejudice or the striking of a portion of the complaint's allegations."  *Jackson v. Bank of Am., N.A.*, 898 F.3d 1348, 1358 (11th Cir. 2018).  Rather, "the key is whether the plaintiff had fair notice of the defects and a meaningful chance to fix them. If that chance is afforded and the

---

[19] In the Order, the district court went further and explained that it would have been "well within its right to dismiss [the FAC] as [a] shotgun pleading[]" but then proceeded to "engage on the substantive issues" presented in the FAC.  Order at 22 n.9.

plaintiff fails to remedy the defects, the district court does not abuse its discretion in dismissing the case with prejudice on shotgun pleading grounds." *Id.*

**Second**, Reed did not ask for a further opportunity to amend his complaint below, file a motion to amend his complaint as required by Fed. R. Civ. P. 15(a)(2), or come forward with a proposed Second Amended Complaint. This Court has specifically "rejected the idea that a party can await a ruling on a motion to dismiss before filing a motion for leave to amend." *Avena v. Imperial Salon & Spa, Inc.*, 740 F. App'x 679, 683 (11th Cir. 2018) (affirming dismissal with prejudice where "the only request [plaintiff] made for leave to file an amended complaint prior to the district court's dismissal of her complaint was a single line at the end of her motion in opposition to [the] motion to dismiss" and "[t]his request was improper because it neither contained a proposed amendment, nor did it elaborate on the substance of the proposed amendment");*see also Rusovici v. Univ. of Cent. Fla. Bd. of Trustees*, 2023 WL 9190224, at *14 (M.D. Fla. Dec. 9, 2023) ("district court need not give the plaintiff another chance when the court has already given instructions concerning a deficiency in the complaint and the plaintiff squanders it").

And **third**, Reed's Brief ignores cases where, like here, dismissal of defamation claims with prejudice is appropriate where the challenged statements are not actionable as a matter of law. *See*, *e.g.*, *Parekh v. CBS Corp.*, 820 F. App'x 827, 834 (11th Cir. 2020) ("We agree with the district court that leave to amend would

be futile, because no amendment could correct the deficiency that the statements in the news report are not defamatory as a matter of law."); *Sloan v. Shatner*, 2018 WL 3769968, at *7 (M.D. Fla. June 22, 2018) (dismissing defamation claim with prejudice because "[w]here ... amending would be futile, leave to amend is properly denied" and "[a]mending would be futile because a viable defamation action does not exist based on the statements" alleged in the operative complaint).[20]

In sum, there is no merit to Reed's argument that he should have been given another opportunity to amend his pleading, whether reviewed *de novo* or for abuse of discretion.  This Court in *Michel* recognized the critical role that courts play in quickly disposing of untenable defamation claims because of the chilling effect such claims have on defendants' free speech rights.  816 F.3d at 702 (noting the "powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation").  The district court, after reviewing Reed's original and amended pleadings and without a proposed second amended complaint or motion to amend, did not abuse its discretion in denying Reed a third bite at the apple and dismissing his meritless suit with prejudice.

---

[20] The only cases that Reed cites to persuade this Court that dismissal with prejudice was inappropriate (*see* Brief at 48-49) did not involve defamation claims and dismissed a plaintiff's *initial* complaint, whereas here Reed has previously been afforded two attempts to assert plausible claims challenging the Book and Article. *See* Brief at 48-49 (citing *Woldeab* & *Thomas*).

## V. ANY FURTHER ISSUES HAVE BEEN WAIVED FOR APPELLATE REVIEW

Finally, Reed's Brief does not challenge several holdings from the district court's Order, including, among others, the dismissal of all claims against Newsham for failure to prosecute, the dismissal of all claims against defendant Newsham because those claims would fail for the same reason as the claims asserted against NYP, and the dismissal of non-actionable opinion Statements from the Book and Article reporting on the lead up to the 2021 Ryder Cup.

To the extent that Reed attempts to address these and any other issues for the first time in his reply brief, this Court should find that he has waived those arguments and the Court should not consider them.  *See*, *e.g.*, *Affordable Aerial Photography, Inc. v. Trends Realty USA Corp*, 2024 WL 835235, at *4 n.3 (11th Cir. Feb. 28, 2024) ("As we repeatedly have admonished, arguments raised for the first time in a reply brief are not properly before a reviewing court.") (citation omitted).

## <u>CONCLUSION</u>

Based on the foregoing, Appellees request that this Court affirm the district court's Order below in its entirety, which dismissed all claims against them with prejudice.

Dated:  July 19, 2024

*/s/ Jeremy A. Chase*
Jeremy A. Chase

THOMAS & LoCICERO PL

Carol Jean LoCicero (FBN 603030)
Linda R. Norbut (FBN 1011401)
601 South Boulevard
Tampa, FL  33606
Telephone: (813) 984-3060
Facsimile:  (813) 984-3070
clocicero@tlolawfirm.com
lnorbut@tlolawfirm.com

*Attorneys for Appellees Hachette Book Group, Inc., Shane Ryan, and NYP Holdings, Inc. D/B/A The New York Post*

DAVIS WRIGHT TREMAINE LLP

Jeremy A. Chase
Jesse Feitel
1251 Avenue of the Americas, 21st Fl.
New York, NY  10020
Telephone: (212) 489-8230
Facsimile:  (212) 489-8340
jeremychase@dwt.com
jessefeitel@dwt.com

Laura R. Handman
1301 K Street NW, Suite 500 East
Washington, D.C. 20005
Telephone: (202) 973-4200
Facsimile: (202) 973-4499
laurahandman@dwt.com

## CERTIFICATE OF COMPLIANCE

Counsel for Appellees Hachette Book Group, Inc., Shane Ryan, and NYP Holdings, Inc. hereby submits their Certificate of Compliance pursuant to Fed. R. App. P. 32 and hereby certify:

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 12,995 words.

2.  This brief complies with the typeface requirements of Fed. R. App. P.32(a)(5) and the type-style requirements of Fed. R. App. P.32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word 365 in a 14-point font, Times New Roman.

## CERTIFICATE OF SERVICE

I certify that on July 19, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to counsel of record.

/s/ Jeremy A. Chase
Jeremy A. Chase